### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>QUORUM HEALTH CORP.,<br>　　　　Reorganized Debtor | Chapter 11<br><br>Case No. 20-10766 (BLS) |
| DANIEL H. GOLDEN, as Litigation Trustee of the QHC LITIGATION TRUST and WILMINGTON SAVINGS FUND SOCIETY, FSB, solely in its capacity as Indenture Trustee<br><br>　　　　　　Plaintiffs,<br>　　v.<br><br>COMMUNITY HEALTH SYSTEMS, INC.; CHS/COMMUNITY HEALTH SYSTEMS, INC.; REVENUE CYCLE SERVICE CENTER, LLC; CHSPSC, LLC; PROFESSIONAL ACCOUNT SERVICES, INC.; PHYSICIAN PRACTICE SUPPORT, LLC; ELIFIBILITY SCREENING SERVICES, LLC; W. LARRY CASH; RACHEL SEIFERT; ADAM FEINSTEIN; AND CREDIT SUISSE SECURIITES (USA) LLC,<br><br>　　　　　　Defendants. | Adv. Pro. No. 21-51190 (BLS)<br><br>Re: Adv. D.I. 1, 43 |

## OPINION[1]

---

[1] This Court has jurisdiction to decide the Motion to Dismiss pursuant to 28 U.S.C. § 157 and § 1334(b). The Bankruptcy Court also has the power to enter an order on a motion to dismiss even if the matter is non-core or the Court has no authority to enter a final order on the merits. *Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*, 2014 WL 1320145, *2 (Bankr. D. Del. Apr. 2, 2014) citing *In re Trinsum Grp., Inc.*, 467 B.R. 734, 739 (Bankr. S.D.N.Y. 2012) ("After *Stern v. Marshall*, the ability of bankruptcy judges to enter interlocutory orders in proceedings . . . has been reaffirmed . . . ."). Pursuant to Fed. R. Civ. P. 52 (made applicable here through Fed. R. Bankr. P. 7052) the Court does not make findings of fact for purposes of a decision on a Fed. R. Civ. P. 12(b) motion.

On April 7, 2020, Quorum Health Corporation and 134 related entities[2] filed chapter 11 bankruptcy petitions.   On June 30, 2020, the Court entered its Findings of Fact, Conclusions of Law and Order Approving the Debtors' Disclosure Statement for, and Confirming, the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization (the "Confirmation Order").[3]   The confirmed Plan[4] established the QHC Litigation Trust (the "Trust") at the request of the holders of certain Senior Notes to investigate potential causes of action and to prosecute or settle, on behalf of the Trust's beneficiaries, all claims and causes of action of the Debtors or their bankruptcy estates that were transferred to the Trust.

On October 25, 2021, Daniel H. Golden, as Litigation Trustee of the QHC Litigation Trust (the "Trustee") and Wilmington Savings Fund Society, FSB ("WSFS" or the "Indenture Trustee")[5] filed a Complaint against Community Health Systems, Inc. and related entities and officers of CHS (the "CHS Defendants")[6] and Credit Suisse Securities (USA), LLC ("Credit Suisse").   The Complaint asserts numerous claims for intentional and constructive fraudulent transfers, breach of contract for unpaid amounts due on the Senior Notes, illegal dividend, aiding and abetting illegal dividend, and unjust enrichment.

---

[2] By Order dated April 8, 2020 (Main Case Docket No. 58), the Court approved joint administration of 135 chapter 11 debtors under the bankruptcy case of Quorum Health Corporation (Case No. 20-10766). A complete list of the 135 jointly administered chapter 11 debtors (the "Debtors") can be found in Docket No. 58.

[3] Main Case Docket No. 556.

[4] The Revised Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization (the "Plan") is attached as Exhibit 1 to the Confirmation Order.

[5] WSFS filed the Complaint solely in its capacity as the Indenture Trustee under that certain indenture (the "Indenture"), dated as of April 22, 2016, for the unsecured 11.625% Senior Notes due April 2023 (the "Senior Notes"). The Trustee and WSFS are referred to herein as "Plaintiffs."

[6] The CHS Defendants include Community Health Systems, Inc. ("CHS"); CHS/Community Health Systems, Inc.("CHS-2"); Revenue Cycle Service Center, LLC; CHSPSC, LLC; Professional Account Services, Inc.; Physician Practice Support, LLC; Eligibility Screening Services, LLC; W. Larry Cash; Rachel Seifert; and Adam Feinstein.

The CHS Defendants filed a Motion to Dismiss[7] numerous counts in the Complaint.[8] The Plaintiffs oppose the CHS Defendants' Motion to Dismiss.[9] The Court has heard oral argument on four pending motions, including the CHS Motion to Dismiss[10] The matters are ripe for determination.

For the reasons set forth in this Opinion, the Motion to Dismiss will be granted in part and denied in part. Counts One and Two of the Complaint seek to avoid the Spin-Off Dividend (defined below) as a constructive and intentional fraudulent transfer under Bankruptcy Code §§ 544 and 550 and applicable state law. As discussed more fully below, those Counts must be dismissed because the transfer is protected by safe harbor provisions of Bankruptcy Code Section 546(e). For the reasons stated herein, the Motion to Dismiss Counts Twelve, Thirteen, Fourteen and Fifteen will be denied.

## FACTUAL ALLEGATIONS

The following is a summary of the Complaint's extensive factual allegations.

The Plaintiffs allege that in 2015 CHS's stock was in free-fall, due to declining operating performance and more than $17 billion in debt, $1.2 billion of which was coming due in 2016 and 2017 (Compl. ¶¶ 1, 32). Without access to traditional sources of capital to refinance its maturing debt and facing rating downgrades and the prospect of its own bankruptcy (Compl. ¶¶ 1, 2, 33, 96), the

---

[7] Adv. Docket No. 43.

[8] The Memorandum of Law in Support of the CHS Defendants' Motion to Dismiss addresses arguments to dismiss Counts I, II, XII, XIII, XIV, and XV. (Adv. Docket No. 44). The CHS Defendants' motion to dismiss Counts III, IV, XI (in part) and other claims are not fleshed out in the parties' briefing and will not be considered.

[9] The Plaintiffs filed a brief in opposition to the Motions to Dismiss. (Adv. Docket No. 68). The CHS Defendants filed a reply brief (Adv. Docket No. 84).

[10] The four motions are: (i) The CHS Motion to Dismiss (Adv. Docket No. 43); (ii) Credit Suisse's Motion to Dismiss for Failure to State a Claim (Adv. Docket No. 47); (iii) Quorum Health Corporation's Motion to Intervene (the "Motion to Intervene") (Adv. Docket No. 54); and (iv) Defendants' CHS, W. Larry Cash and Rachel Seifert's Motion to Stay Litigation Pending Arbitration (the "Stay Motion") (Adv. Docket No. 61). This opinion addresses the first item; the remaining motions will be addressed in separate opinions.

Plaintiffs allege that CHS devised a scheme to raise $1.21 billion needed to pay down its debt, while simultaneously divesting some of its worst-performing assets (the "Spin-Off"). (Compl. ¶¶ 2, 36).

The Plaintiffs allege that CHS effectuated the scheme by creating Quorum Health Corporation ("Quorum" or "QHC") as a wholly owned subsidiary and by contributing the following assets to Quorum: (i) 38 hospitals located primarily in rural areas with populations of 50,000 or less (the "Quorum Hospitals"), and (ii) a small consulting business called Quorum Health Resources ("QHR" and together with the Quorum Hospitals, the "Quorum Assets"). (Compl. ¶2, 36). The Plaintiffs claim that a Separation and Distribution Agreement (the "SDA") between CHS and Quorum purported to set forth the terms governing the legal and structural separation of Quorum from CHS. (Compl. ¶ 82). The Plaintiffs further allege that the SDA was drafted entirely by CHS and was heavily one-sided in CHS's favor. (Compl. ¶ 82).

The Plaintiffs allege that CHS then manipulated the financial projections of a standalone Quorum so that Quorum could incur over $1.2 billion in debt (the "Spin-Off Debt"). (Compl. ¶¶ 5-6, 54). In particular, the Plaintiffs allege that the Spin-off Debt included the following:

(a) On April 22, 2016, CHS caused Quorum to borrow approximately $400 million through issuance of the unsecured Senior Notes (Compl. ¶ 64);

(b) On April 29, 2016, CHS caused Quorum to enter into: (i) approximately $880 million of senior term loan credit facilities (the "Term Loan"); (ii) a revolving credit facility of up to an aggregate of approximately $100 million (the "RCF"); and (iii) an asset-based revolving credit facility

providing for up to an aggregate principal amount of approximately $125 million (the "ABL") (Compl. ¶ 64).

The same day the Spin-Off was consummated, the Plaintiffs allege that CHS caused Quorum to transfer the Spin-Off Debt of $1.21 billion to CHS as a tax-free dividend (the "Spin-Off Dividend"). (Compl. ¶3). The Plaintiffs assert that Quorum paid the Spin-Off Dividend to CHS's wholly owned indirect subsidiary BridgeCo, which then merged with and into CHS-2, which is also wholly owned by CHS. (Compl. ¶ 85). The Plaintiffs assert that Quorum's incurrence of the Spin-Off Debt and payment of the Spin-Off Dividend left Quorum balance sheet insolvent, unable to pay its debts as they came due, and inadequately capitalized. (Comp. ¶ 85).

The Plaintiffs also allege that CHS engaged in the following fraudulent acts to complete this scheme:

- CHS constituted the initial Quorum Board only with CHS senior officials, who rubber-stamped the Spin-Off and Spin-Off Dividend without holding a single in-person meeting, and who immediately resigned from the Quorum Board once the Spin-Off Dividend was approved and paid. (Compl.¶¶ 4, 39-43, 82-86).

- CHS created fraudulently inflated projections for Quorum that significantly overstated projected revenues, margins, and the number and proceeds of asset sales, while significantly understating costs, at a time when Quorum's actual operating results showed that these projections defied reality. (Compl. ¶¶ 5-6, 54).

- CHS systematically increased Quorum's projected free cash flow when the credit markets began to tighten to offset the increasing cost of debt, ultimately inflating that number by approximately $118 million. (Compl. ¶¶ 5-6, 62).

- CHS retained Credit Suisse to serve as Quorum's investment banker and leveraged its longstanding relationship with Credit Suisse so that Credit Suisse would turn a blind eye to the fact that

the debt it was helping CHS raise would render Quorum insolvent, inadequately capitalized, and unable to pay its debts as they came due. (Compl. ¶¶ 7, 44).

- CHS appointed CHS executives to serve as the leaders of Quorum post-Spin-Off and used its control over those executives prior to the Spin-Off to prevent them from preparing to operate Quorum as a standalone company or otherwise take steps that would reveal the fraudulent nature of the transaction. (Compl. ¶¶ 8, 78-79).

- CHS curtailed investments in the Quorum Assets in the months leading up to the Spin-Off, neglecting ordinary maintenance and improvements to prioritize hospitals that would remain with CHS post-Spin-Off (Compal. ¶¶ 9, 74-77).

- CHS burdened Quorum with onerous transition services agreements that afforded CHS a steady stream of payments regardless of the level of CHS's performance under the agreements. (Compl. ¶¶ 9, 68-73).

The Plaintiffs allege that Quorum fared poorly immediately after the Spin-Off was completed in April 2016, as CHS had simply offloaded its own unsolvable debt problem onto Quorum and left Quorum with less than $14 million cash on hand. (Compl. ¶ 10). The Plaintiffs claim that Quorum violated its debt covenants almost immediately after the Spin-Off was consummated and was forced to enter into costly amendments to its term loan and dedicate virtually all of its available cash flows to debt repayment. (Compl. ¶¶ 10, 89-92).

Although Quorum was able to operate for several years through expensive and onerous amendments to its credit agreements and an aggressive divestiture of assets (ultimately selling 15 of 38 Quorum hospitals), the Plaintiffs allege that Quorum eventually needed to file bankruptcy on April 7, 2020. (Compl. ¶¶ 93-95). Quorum's CFO testified in the bankruptcy case that the chapter 11 filing was

6

"driven by the financial obligations produced by the capital structure [Quorum] has operated with since its inception, rather than the underlying business performance." (Compl. ¶¶ 11, 95).[11]

## STANDARD:  MOTION TO DISMISS

When reviewing a motion to dismiss, the court will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[12]  In *Twombly*, the Supreme Court instructed that a pleading must nudge claims "across the line from conceivable to plausible."[13] "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[14]

The Third Circuit follows a three-step process to determine the sufficiency of a complaint:

> First, the court must "take note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[15]

---

[11] Compl. ¶ 95 (citing Decl. of Alfred Lumsdaine, Executive Vice President and Chief Financial Officer of Quorum Heath Corporation, in Support of Chapter 11 Petitions and First Day Motions, ¶9 (Main Case Docket No. 24)).

[12] *Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*, 879 F.3d 79, 83 n.6 (3d Cir. 2018).

[13] *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[14] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[15] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).

The movant carries the burden of showing that the dismissal is appropriate.[16]

## DISCUSSION

**1.**   **The Safe Harbor of Bankruptcy Code § 546(e)**

**A.**   Does the Safe Harbor of Bankruptcy Code § 546(e) bar the Trustee's Fraudulent Transfer Claims brought on behalf of the estate?

Counts One and Two of the Complaint against CHS and CHS-2 seek to avoid and recover the Spin-Off Dividend as constructive and intentional fraudulent transfers under 11 U.S.C. §§ 544 and 550 and applicable state fraudulent transfer law.[17]

The CHS Defendants argue that the Plaintiffs' avoidance claims in Counts One and Two are barred by Bankruptcy Code § 546(e) because the Spin-Off Dividend was (i) a transfer, (ii) made by or to (or for the benefit of) a financial participant, (iii) in connection with a securities contract.[18] The CHS Defendants further argue that the Spin-Off Dividend was made in connection with the SDA, which was a "securities contract," as well as other related contracts for the purchase and sale of securities. The CHS Defendants also argue that CHS-2 is a "financial participant" as defined in Bankruptcy Code § 101(22A).

---

[16] *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 408 (D. Del. 2007).

[17] Specifically, the Plaintiffs seek avoidance under Delaware, New York, and Tennessee state law, as applicable. (Compl. ¶¶ 103, 107).

[18] Section 546(e) provides in relevant part that:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, **the trustee may not avoid . . . a transfer made by or to (or for the benefit of) a ... financial participant ... in connection with a securities contract**, as defined in section 741(7) ... **that is made before the commencement of the case**, except under section 548(a)(1)(A).

11 U.S.C. § 546(e) (emphasis added). The Complaint does not assert any claims under § 548(a)(1)(A).

The Plaintiffs contend that whether the safe harbor of § 546(e) protects the Spin-Off Dividend requires a fact-based inquiry and should be considered in a motion to dismiss only if "the defense is clearly established on the face of the complaint."[19]  The Plaintiffs assert that the CHS Defendants' § 546(e) defense is contradicted by the Complaint's allegations and is based, in part, upon agreements that are not integral to the Complaint.  The Plaintiffs further argue that analyzing whether CHS-2 is a "financial participant" is a factual issue that also should not be considered on a motion to dismiss.

The safe harbor of § 546(e) applies when two requirements are met: "(1) there is a *qualifying transaction* (i.e., there is a 'settlement payment' or a transfer payment . . . made in connection with a securities contract), and (2) there is a *qualifying participant*  (i.e., the transfer was 'made by or to (or for the benefit of) a ... financial institution, [or financial participant]')."[20]

(i)     <u>Transfer</u>

The first step in a § 546(e) analysis requires the Court to identify the relevant transfer.[21]  The Complaint describes the transfer as follows: "QHC paid the Spin-Off Dividend to CHS's wholly owned indirect subsidiary BridgeCo, which then merged with and into CHS-2, which is also wholly owned by CHS."[22]  This is consistent with

---

[19] *Zazzali v. AFA Fin. Grp., LLC (In re DBSI, Inc.)*, 477 B.R. 504, 515 (Bankr. D. Del. 2012).
[20] *SunEdison Litig. Trust v. Seller Note, LLC (In re SunEdison, Inc.)*, 620 B.R. 505, 513 (Bankr. S.D.N.Y. 2020) (quoting *In re Nine West LBO Sec. Litig.*, 482 F.Supp.3d 187, 197 (S.D.N.Y. 2020)).
[21] *SunEdison*, 620 B.R. at 513 (citing *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, ___ U.S. ___, 138 S.Ct. 883, 892, 200 L.Ed.2d 183 (2018)).
[22] Compl. ¶ 85.

the transfer identified in the CHS Defendants' Motion to Dismiss, so there is no dispute as to the transfer at issue.

(ii)   Securities Contract

The next question is whether the transfer was made in connection with a "securities contract." Section 546(e) refers to § 741(7), which broadly defines "securities contract" to include "a contract for the purchase, sale or loan of a security" as well as "any other agreement or transaction that is similar to" such agreement.[23] The term "security," in turn, is also broadly defined in the Bankruptcy Code to include a "note," "stock," "transferable share," or "other claim or interest commonly known as 'security.'"[24]

The SDA provided that "QHC shall distribute cash proceeds from the QHC Financing Transaction … in partial consideration for the ultimate transfer of QHC Assets to QHC."[25] The term "QHC Assets" is defined in the SDA as including "all of the issued and outstanding capital stock or other equity interests of the Transferred Entities."[26] Thus, the language of the SDA clearly includes the sale of securities.

The Plaintiffs, however, argue that CHS drafted the SDA using self-serving language that should not be solely relied upon in the safe harbor analysis. The Plaintiffs claim that the extensive allegations in the Complaint demonstrate that the Spin-off Dividend was a gratuitous dividend not paid in consideration for the QHC Assets, which continued to be owned, indirectly, by CHS's shareholders. The

---

[23] 11 U.S.C. § 741(7)(A)(i) and (vii).
[24] 11 U.S.C. § 101(49)(A)(i), (ii), (viii) and (xiv).
[25] SDA, § 2.07(b). A copy of the SDA, which is referred to in the Complaint, is attached to the Declaration of Gary A. Orseck in Support of Memorandum in Support of the CHS Motion to Dismiss (Adv. D.I 45-1).
[26] SDA, Art. I, at p. 9.

Plaintiffs also rely upon language in the CHS Form 8-K dated May 2, 2016 to assert that, rather than a purchase and sale agreement, the SDA was described as an agreement "setting forth, among other things, agreements regarding the principal actions needed to be taken in connection with [a] Spin-off" and "also set[ting] forth other agreements that govern certain aspects of [the] relationship following the Spin-off." The Plaintiffs argue that further discovery is needed to determine the true nature of the SDA.

But there is no question that the SDA between CHS and Quorum exists and that the transaction in which Quorum transferred the Spin-Off Dividend in return for certain assets, including stock and other equity interests of the Transferred Entities, was clear on the face of the documents.[27]  The lack of details about the transaction in the Form 8-K does not alter the framework in the document.  The SDA  falls within the definition of a securities agreement found in Bankruptcy Code § 546(e) and § 741(7).

Moreover, the Plaintiffs' reliance on certain caselaw also does not support their argument.  In *Pitt Penn Holding Company*, the court declined to dismiss a complaint under § 546(e) because disputed issues of material fact remained over whether stock transfers were made as charitable gifts and not pursuant to a

---

[27] "Transferred Entities" is defined as "the entities set forth on Schedule 1.01(g)" attached to the SDA. SDA, Art. I at 15. *See also* SDA, § 2.07.

securities contract.[28] Here, the Plaintiffs dispute the CHS's motive for entering into the SDA, but not its actual terms.[29]

Also, in *Tops Holding II*,[30] the court denied the defendants' request to safe harbor dividend transfers under § 546(e) when those defendants argued that the dividends were part of an integrated transaction that started with issuance of private notes (involving securities contracts) and ended with the payment of dividends.[31] In *Tops*, Judge Drain concluded that the complaint sought to avoid the dividend payments, not the notes offerings, and found the "integrated transaction" argument "difficult" to accept under the precedent in *Merit Management*.[32] The *Tops* decision does not support the Plaintiffs' argument here because the allegedly avoidable transfers are referenced directly in and occurred pursuant to the SDA.

Accordingly, this Court concludes that the Spin-Off Dividend was made pursuant to a securities contract, *i.e.,* the SDA, and is a qualifying transfer under § 546(e).

---

[28] *In re Pitt Penn Holding Co., Inc.*, 2011 WL 4352373, *13 (Bankr. D. Del. Sept. 16, 2011).

[29] *See also Miller v. Black Diamond Capital Mgmt., L.L.C. (In re Bayou Steel BD Holdings, L.L.C.),* 642 B.R. 371, 389 (Bankr. D. Del. 2022) (in denying a motion to dismiss claims based on § 546(e), the court decided that a transfer was not made in connection with a securities contract when that contract did not reference the contemplated distribution and the complaint did not allege that the contract's proceeds were used to pay the distribution).

[30] *Halperin v. Morgan Stanley Inv. Mgmt., Inc. (In re Tops Holding II Corp.),* 646 B.R. 617 (Bankr. S.D.N.Y. 2022)

[31] *Tops* at 681.

[32] *Tops* at 681-82 (citing *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.,* ___ U.S. ___, 138 S.Ct. 883, 200 L.Ed.2d 183 (2018); *Greektown Litig. Trust v. Papas (In re Greektown Hldgs., LLC),* 621 B.R. 797, 808 (Bankr. E.D. Mich. 2020) (deciding that, for purposes of section 546(e), *Merit Mgmt.* precluded application of the step transaction doctrine (which provides that interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction) if defendants rely on a component part of the sequence instead of the overall transfer to be avoided.)

(iii)   <u>Financial Participant</u>

The next inquiry to establish that § 546(e) safe harbor protection applies to the Spin-Off Dividend is whether the transfer was made to a qualifying participant.[33] Here, the CHS Defendants assert that CHS-2 is a "financial participant" because on at least one day during the 15-month period preceding the filing of the bankruptcy petition (April 7, 2020), it was counterparty to one or more securities contracts with a total gross dollar value of not less than $1 billion.[34]   In support, the CHS Defendants refer to private offerings of senior secured notes completed by CHS-2 on March 6, 2019 in the amount of $1.601 billion and on February 6, 2020 in the amount of $1.462 billion.  They also claim that on November 19, 2019, CHS-2 executed a tender offer in which it exchanged new notes with an aggregate principal amount of approximately $2.4 billion for preexisting notes of the same amount.[35]

The Plaintiffs argue that the Spin-Off Dividend was paid to BridgeCo, not CHS-2, and BridgeCo is not a "financial participant" under the Bankruptcy Code. But the CHS Defendants argue that BridgeCo undisputedly merged into CHS-2 in

---

[33] The qualifying participants listed in the statute include "a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency."

[34] "Financial participant" is defined in Bankruptcy Code § 101(22A) as including "an entity that, at the time it enters into a securities contract, ... or at the time of the date of the filing of the petition, has one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5) or (6) of section 561(a) with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition ...."

[35] The CHS Defendants attached copies of CHS's SEC filings to provide evidence of the offerings.  *See* Decl. of Gary A. Orseck in Support Defendants' Motion to Dismiss (Adv. Docket No. 45), Ex. 13 (CHSI Form 10-K dated 2/20/2020) and Ex. 14 (CHSI From 10-K).

connection with the Spin-Off[36] and, therefore, the transfer was made to, or for the benefit of, CHS-2 (the surviving entity of the merger). The Plaintiffs disagree, claiming that because the merger happened *after* the transfer, CHS-2 is a subsequent transferee not covered by § 546(e).

In *Merit*, "the Supreme Court concluded that 'the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions.'"[37] Thus, the *Merit* court determined that if a qualifying participant (such as a financial institution) serves as a mere conduit or intermediary within a component of the overarching transfer between non-qualifying participants, then § 546(e) will not apply.[38] The *SunEdison* court, reviewing a similar "subsequent transferee" argument as the one at bar, decided:

> While *Merit* defined the relevant transfer as the overarching transfer that the trustee seeks to avoid, it does not follow that the trustee can escape the reach of the safe harbor by seeking to avoid an intermediate transfer between non-qualifying participants and sue the qualifying participants of the true overarching transfer as subsequent transferees.[39]

As discussed above, the overarching transfer that the Plaintiffs seek to avoid in Counts One and Two of the Complaint is the transfer from Quorum to CHS-2. The Plaintiffs cannot escape application of § 546(e) by claiming that the transfer to

---

[36] *See* Compl. ¶¶ 85 and 98.
[37] *SunEdison*, 620 B.R. at 513 (quoting *Merit*, 138 S.Ct. at 893).
[38] *SunEdison*, 620 B.R. at 513 (citing *Merit*, 138 S.Ct. at 892, 897).
[39] *SunEdison*, 620 B.R. at 513-14 (citing *Holliday v. K Road Power Mgmt., LLC (In re Boston Generating LLC)*, 617 B.R. 442 (Bankr. S.D.N.Y. 2020)).

BridgeCo (a non-qualifying participant) is avoidable and may be recovered from CHS-2 (a qualifying participant) as a subsequent transferee.

Moreover, the CHS Defendants argue that it is inconsequential whether the Spin-Off Dividend went directly "to" CHS-2 because the statutory language of § 546(e) equally protects transfers made "for the benefit" of a financial participant. The Complaint alleges that the Spin-Off Dividend was "undertaken for CHS's and CHS-2's sole benefit."[40]  The Court agrees that this statement, as well as the inferences arising from other allegations in the Complaint, demonstrate that the Spin-Off Dividend was "for the benefit" of CHS-2.

What remains, then, is to determine whether CHS-2 meets the definition of a "financial participant."   The CHS Defendants have submitted two SEC filings to support their contention that CHS-2 had sufficient transactions to meet the Code's definition of a financial participant.[41] The Plaintiffs argue that the Court cannot rely on these materials when considering a motion to dismiss because the SEC filings are neither referenced in, relied upon, nor integral to the Complaint.  The Plaintiffs also assert that they must be afforded an opportunity for discovery on this factual issue.

Federal Rule of Evidence 201 permits a court to take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose

---

[40] Compl. ¶ 110.
[41] *See* Adv. Docket No. 45, Ex. 13 (2/20/2020 CHS Form 10-K) at 77-78; Ex. 14  (2/17/2020 CHS Form 10-K) at 109.

accuracy cannot reasonably be questioned."[42] Because SEC filings "are required by law to be filed with the SEC, no serious questions as to their authenticity can exist."[43]  Generally, SEC filings are "relevant not to prove the truth of their contents but only to determine what the documents stated."[44]  The Third Circuit, however, has taken judicial notice of facts in an SEC filing (not just the existence of the document) when considering a motion to dismiss.[45]  In this case, the Court finds it appropriate to take judicial notice of the information in the CHS SEC filings for purposes of determining whether CHS-2 meets the Code's definition of a "financial participant."  Those filings demonstrate that CHS-2 completed  a private offering of senior secured notes in the amount of $1.462 billion on February 6, 2020 (just 2 months prior to the petition date).[46]

Based on the foregoing, the Court concludes that CHS-2 is a financial participant and, therefore, the § 546(e) safe harbor protects the Spin-Off Dividend transfers from avoidance.

---

[42] Fed. R. Evid. 201(b)(2).  *See also Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) ("A number of our sister circuits have held that this rule permits a court, in deciding a motion for judgment on the pleadings, to take judicial notice of properly-authenticated public disclosure documents filed with the SEC." (citations omitted)).

[43] *Oran*, 226 F.3d at 289 (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

[44] *Id.*

[45] *FTC v. Shire ViroPharma,Inc.*, 917 F.3d 147, 151 n. 5 (3d Cir. 2019) (The court accepted statements in an SEC filing about the timeline in which the defendant developed, manufactured, and marketed certain drugs.)

[46] Adv. Docket No. 45, Ex. 14  (2/17/2020 CHS Form 10-K) at 109.

B. **Does § 546(e) bar state law fraudulent transfer claims brought on behalf of the Senior Noteholders?**

The Plaintiffs argue that the Complaint also asserts claims on behalf of approximately 95% of the Senior Noteholders.[47] Even if § 546(e) precludes the Trustee from pursing the fraudulent transfer claims in Counts One and Two on behalf of the Quorum estate, the Plaintiffs contend that the § 546(e) safe harbor does not prevent the Trustee from pursuing state law fraudulent transfer claims as the assignee of the Senior Noteholders. The Plaintiffs rely on the plain language of § 546(e), which provides in pertinent part that:

---

[47] The CHS Defendants argue that this Court lacks subject matter jurisdiction over the claims asserted by the Senior Noteholders in this adversary proceeding. The Plaintiffs argue that the Court has "related to" jurisdiction over the claims pursuant to §1334(b) because these claims have a close nexus to the confirmed bankruptcy plan. "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus" for related to jurisdiction. *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 167 (3d Cir. 2004). The Plaintiffs point out that the *Resorts* court determined that the bankruptcy court lacked "related to" jurisdiction over a litigation trust's claim against its accounting firm, brought almost seven years after plan confirmation, based on conduct that occurred post-confirmation. In contrast, the Plaintiffs assert that creation of a QHC Litigation Trust and granting the Litigation Trustee authority to investigate and pursue claims on behalf of the estate and Senior Noteholders regarding the Defendants' prepetition conduct was an important component of the Plan. The Plan defines the "QHC Litigation Trust Assets" as including "Contributed Claims," which is in turn defined as prepetition causes of action relating to the Senior Notes that are assigned to the Trust. *See* Plan, Art. IV.C.3 and Art. I. 30, 31, 123 and 124. The CHS Defendants challenge this Court's jurisdiction only with respect to the assigned Senior Noteholders' claims, and not to the transferred estate causes of action, which arise out of the same facts and circumstances. The Court concludes that there is a sufficient close nexus between the Senior Noteholders' claims and the implementation and execution of the Plan to satisfy "related to" jurisdiction.

The CHS Defendants also assert that the Plaintiffs cannot assert claims on behalf of the Senior Noteholders until the Litigation Trustee abandons his authority to assert those claims under the aegis of the estate. The CHS Defendants rely on *Wilton Armetale, Inc. v. North Mill Capital, LLC*, 968 F.3d 273 (3d Cir. 2020), a chapter 7 case, in which the court concluded that the trustee must overtly abandon an estate cause of action during the bankruptcy case before the right to pursue that action would revert to a creditor. *Id.* at 284. Abandonment is not necessary in this case, however, because (unlike in *Wilton*), the confirmed Plan overtly transferred the right to pursue both estate and Senior Noteholders' "Contributed Claims" to the Litigation Trust. *See* Plan, Art. IV.C.3 and Art. I. 30, 31, 123 and 124.

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, *the trustee* may not avoid a transfer . . . [48]

The Plaintiffs argue that this language restricts only the powers of the "trustee," which the Code defines as the "representative of the estate."[49]  The Plaintiffs also note that § 546(e)'s prefatory clause references sections 544, 545, 547, and 548, which are all avoidance claims under federal law that only a trustee, not the estate's creditors, can pursue.  The Plaintiffs argue this demonstrates congressional intent to apply § 546(e)'s restrictions only to the trustee's federal avoidance powers and they claim the safe harbor does not bar individual creditors' state law avoidance actions.

The CHS Defendants argue in response that the bar in § 546(e) *preempts* the Plaintiffs from pursuing § 544 avoidance claims as the assignee and representative of the Senior Noteholders. They rely upon  the Second Circuit's decision in *Tribune Fraudulent Conveyance Litigation*, which determined that allowing creditors to bring claims that the trustee cannot gives rise to a conflict with the purpose of § 546(e), noting "the idea of preventing a trustee from unwinding specified transactions while allowing creditors to do so, but only later, is a policy in a fruitless search of a logical rationale."[50]

If § 546(e) bars estate avoidance actions, does § 546(e) also preempt individual creditors from asserting state law fraudulent transfer claims?  Under the Constitution's Supremacy Clause (Article VI, Clause 2), federal law prevails when it

---

[48] 11 U.S.C. § 546(e) (emphasis added).
[49] 11 U.S.C. §323(a).
[50] *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 91 (2d Cir. 2019).

conflicts with state laws.[51] "Under the implied preemption doctrine, state laws are 'pre-empted to the extent of any conflict with a federal statute. Such a conflict occurs ... when [ ] state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[52]

The *Tribune* court recognized that:

> Congress's power to enact bankruptcy laws was made explicit in the Constitution as originally enacted, Art. 1, § 8, cl. 4, and detailed, preemptive federal regulation of creditors' rights has, therefore, existed for over two centuries. ... Once a party enters bankruptcy, the Bankruptcy Code constitutes a wholesale preemption of state laws regarding creditors' rights.[53]

Thus, the *Tribune* court decided that any state law avoidance claims held by the *Tribune* creditors "were preempted when the Chapter 11 proceedings commenced and were not dismissed," and those claims were vested in the trustee under § 544(b) upon filing.[54]

The *Tribune* creditors, however, argued if a trustee failed to pursue the state law avoidance claims in the bankruptcy case, those claims then reverted to the creditors.[55]  The *Tribune* court determined that the effect of § 546(e) on the creditors' right (if any) to bring the state law avoidance claims was "ambiguous,"[56]

---

[51] *Tribune*, 946 F.3d at 81 (citing *Arizona v. United States*, 567 U.S. 387, 132 S.Ct. 2492, 2500, 183 L.Ed.2d 351 (2012)).

[52] *Tribune*, 946 F.3d at 81.

[53] *Id.* at 82 (citing Charles Jordan Tabb, *The History of the Bankruptcy Laws in the United States*, 3 Am. Bankr. Inst. L. Rev. 5, 7 (1995)).

[54] *Id.* at 83.

[55] *Id.* at 84-85.  The *Tribune* court determined this theory had no basis in the plain language of the Code and resulted in too many "ambiguities, anomalies, or conflicts with the purposes of the Code." *Id.* at 85–90.  The *Tribune* court wrote that it need not decide the reversion issue to address the preemption issues surrounding § 546(e). *Id.* at 90.

[56] *Id.* at 90.

and, therefore, the court considered the preemption issue by looking at § 546(e)'s language,[57] legislative history,[58] and purpose.[59]

The *Tribune* court concluded that "[e]very congressional purpose reflected in Section 546(e), however narrow or broad, is in conflict with [the creditors'] legal theory."[60] Therefore, the *Tribune* court held that the creditors' ability to assert state law avoidance claims was preempted by § 546(e).

The Plaintiffs, however, argue that courts in this district have rejected the reasoning of *Tribune*. In *Physiotherapy*,[61] Judge Gross noted that state law traditionally occupied the field of fraudulent transfer law and, therefore, the court

---

[57] The *Tribune* court disagreed that the § 546(e)'s use of the word "trustee" prevents preemption of individual creditors' rights, deciding that the word must be considered within the context of the entire provision. *Id.* at 91 ("A search for legislative purpose is heavily informed by language, and analyzing all the language of a provision and its relationship to the Code as a whole is preferable to using literalness here and perceived legislative purpose (without regard to language) [ ] as needed to reach particular results.").

[58] The *Tribune* court also noted that the legislative history of § 546(e) "reflects a concern over the use of avoidance powers not only after the bankruptcy of a commodities or securities firm, but also after a "customer" or "other participant" in the securities markets enters bankruptcy. ... Such actions were perceived as creating a danger of "a ripple effect," a chain of bankruptcies among brokers disrupting the securities market generally." *Id.* at 92 (quoting H.R. Rep. No. 97-420 (1982)).

[59] As for legislative purpose, the *Tribune* court noted that:

> Section 546(e) was intended to protect from avoidance proceedings payments by and to commodities and securities firms in the settlement of securities transactions or the execution of securities contracts. ... Unwinding settled securities transactions by claims such as [the *Tribune* creditors'] would seriously undermine -- a substantial understatement -- markets in which certainty, speed, finality, and stability are necessary to attract capital.
>
> . . . .
>
> Allowing creditors to bring claims barred by Section 546(e) to the trustee *et al.* only after the trustee *et al.* fails to exercise powers it does not have would increase the disruptive effect of an unwinding by lengthening the period of uncertainty for covered entities and investors.

*Id.* at 90-91.

[60] *Tribune*, 946 F.3d at 90.

[61] *PAH Litig. Trust v. Water Street Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*, Adv. Pro. No. 15-51238 (KG), 2016 WL 3611831 (Bankr. D. Del. June 20, 2016). *Physiotherapy Holdings* was decided between the Second Circuit's first opinion on the preemption issue in *Tribune* (*In re Tribune Co. Fraudulent Conveyance Litig.* (the "2016 *Tribune* Opinion"), 818 F.3d 98 (2d Cir. 2016)) and the Second Circuit's 2019 *Tribune* opinion (which vacated and superseded the 2016 *Tribune* Opinion), issued after the Supreme Court's decision in *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S.Ct. 883 (2018).

applied a presumption against preemption.[62] The *Physiotherapy* court determined that Congress' stated purpose of § 546(e) was reducing systemic risk to financial markets, and the court found that the particular facts before it (involving a sale in which two controlling shareholders owned more than 90% of the stock) would not implicate those broader market concerns.[63] The *Physiotherapy* court also concluded that preemption was not appropriate based on the plain language of § 546(e), which limited only the *trustee's* avoidance powers.[64]

Therefore, the *Physiotherapy* court concluded that the safe harbor does not bar a litigation trust from asserting state law fraudulent transfer claims as a creditor-assignee when: (1) the transaction sought to be avoided poses no threat of "ripple effects" in the relevant securities markets; (2) the transferees received

---

[62] *Physiotherapy*, 2016 WL 3611831 at *7. The *Physiotherapy* court looked to the district court's opinions in the *Tribune Fraudulent Conveyance Litig.*, 499 B.R. 310 (S.D.N.Y. 2013) which rejected express and field preemption arguments (499 B.R. at 315-16), and *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, 503 B.R. 348 (Bankr. S.D.N.Y. 2014), *abrogated by Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016), writing:

> Beginning with the presumption that "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," the court concluded that (1) there was no express preemption as Congress failed to explicitly state its intention to displace state fraudulent transfer law, (2) there was no field preemption as federal and state fraudulent transfer statutes have coexisted for many years, and Congress never demonstrated any intent to "occupy the field" of fraudulent transfer law, and (3) there was no conflict preemption under both the impossibility branch and the obstacle branch.

*Physiotherapy*, 2016 WL 3611831 at *6 (quoting *Lyondell*, 503 B.R. at 359-361 (citations omitted)).

[63] *Id.* at *9.

[64] *Id.* The *Physiotherapy* court noted that other Bankruptcy Code sections explicitly state when a section applies to other entities (*e.g.*, "party in interest") or expressly preempt state law by incorporating phrases such as "notwithstanding any applicable law." *Id.* (citing, *e.g.*, 11 U.S.C. § 1109(b) and § 541(c)(1)).

payment for non-public securities, and (3) the transferees were corporate insiders that allegedly acted in bad faith.[65]

The presumption against preemption relied on in *Physiotherapy* weighs most heavily when a particular regulatory area is "traditionally the domain of state law,"[66] but as *Tribune* discussed above, it has long been recognized that the Bankruptcy Code preempts a host of state laws regarding creditors rights. Moreover, "the policies reflected in Section 546(e) relate to securities markets, which are subject to extensive federal regulation."[67]  The language of §546(e) is broad and does not support line drawing for each case when considering whether preemption applies.  The *Tribune* court recognized that "Section 546(e) is simply a case of Congress perceiving a need to address a particular problem within an important process or market and using statutory language broader than necessary to resolve the immediate problem."[68]

This Court finds the reasoning of *Tribune* to be persuasive here.  Accordingly, the safe harbor of § 546(e) preempts the Plaintiffs' ability to pursue avoidance claims under state law fraudulent transfer law as assignees of the Senior Noteholders.  The Motion to Dismiss is granted as to Counts One and Two.

---

[65] *Id.* at *10.  The district court denied the *Physiotherapy* defendants' subsequent motion to appeal the bankruptcy court's interlocutory order deciding, in relevant part, that there was no substantial ground for difference of opinion "as the bankruptcy court's preemption analysis followed well-established Third Circuit and Supreme Court law." *PAH Litig. Trust v. Water Street Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*, Misc. No. 16-201-LPS, 2017 WL 6524524, *9 (D. Del. Dec. 21, 2017).

[66] *Tribune*, 946 F.3d at 82 (quoting *Hillman v. Maretta*, 569 S. 483, 133 S.Ct. 1943, 1950, 186 L.Ed.2d 43 (2013)).

[67] *Tribune*, 946 F.3d at 83.

[68] *Tribune*, 946 F.3d at 92.

The Court notes that it is constrained by the broad language of Bankruptcy Code § 546(e) to dismiss these claims despite the fact that the Plaintiffs here have plausibly alleged that the Defendants constructed a scheme for the purpose of siphoning funds from the Debtor for the Defendants' benefit. In his last opinion before retiring from the bench, Judge Robert D. Drain discussed his concerns regarding the reach of § 546(e), writing "[g]iven the importance of fraudulent transfer law in bankruptcy cases, Congress should act to restrict *to public transactions* its current overly broad free pass in section 546(e) that has informed the playbook of private loan and equity participants to loot privately held companies to the detriment of their non-insider creditors with effective impunity."[69] The undersigned agrees with Judge Drain's concerns and sentiments.

C.   <u>Does the safe harbor bar state law claims for illegal dividend and unjust enrichment?</u>

The CHS Defendants also assert that the Court must dismiss certain state law claims that attack transfers otherwise protected by § 546(e). In particular here, the CHS Defendants argue for dismissal of the claims for recovery under theories of illegal dividend, aiding and abetting illegal dividend, and unjust enrichment (Counts Thirteen, Fourteen and Fifteen). The Defendants contend that allowing a plaintiff to assert state law claims to recover the same payments which were held to

---

[69] *Halperin v. Morgan Stanley Inv. Mgmt., Inc. (In re Tops Holding II Corp.)*, 646 B.R. 617, 688 (Bankr. S.D.N.Y. 2022) (emphasis in original).

be unavoidable under § 546(e) "would render the § 546(e) exemption meaningless and would wholly frustrate the purpose behind that section."[70]

In response, the Plaintiffs argue that the illegal dividend and unjust enrichment claims do not seek to "avoid" transfers but seek to hold the CHS Defendants liable for their intentional wrongful and fraudulent acts of causing Quorum to pay the Spin-Off Dividend notwithstanding that they knew, or should have known, that doing so would render Quorum insolvent, inadequately capitalized, and unable to pay its debts as they came due. The Plaintiffs rely on *Lehman Bros.*, in which the court wrote:

> The safe harbors are not all encompassing and do not offer "fail safe" protection against every cognizable claim made in relation to transactions that may fit within the statutory framework. ... The plain language of section 546(e), read literally, provides limited immunity but does not bar Plaintiffs from maintaining all common law claims, intentional fraud claims and any other claims not expressly embraced by section 546(e).[71]

On this issue, the Court agrees with the holding in *Lehman*. The safe harbor of § 546(e) is broad but it does not have unlimited boundaries. The CHS Defendants' motion to dismiss Counts Thirteen, Fourteen and Fifteen as barred by the safe harbor of § 546(e) is denied.

---

[70] *Contemporary Ind. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009) *abrogated in part on other grounds by Merit Management Grp., LP v. FTI Consulting, Inc.*, 138 S.Ct. 883 (2018). *See also Off'l Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Delaware)*, 274 B.R. 71, 96 (D. Del. 2002) (Claims that Congress deemed unavoidable under sections 544(b) and 546(e) of the Bankruptcy Code can not be avoided by simply re-labeling avoidance claims as unjust enrichment claims; if they could the exemption set forth in section 546(e) could be rendered useless.").

[71] *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415, 450 (Bankr. S.D.N.Y. 2012).

2.   **State law claims for illegal dividend and unjust enrichment**

   A.   Are the Plaintiffs' state law claims barred by claim preclusion or issue preclusion?

In 2017, affiliates of CHS[72] commenced an arbitration against Quorum (the "Arbitration"), claiming Quorum breached certain transition service agreements ("TSAs") that were entered into as part of the Spin-Off. Quorum brought counterclaims asserting, among other things, that CHS breached the TSAs by improperly terminating them and that the TSAs were unconscionable. Quorum also asserted a counterclaim for tortious interference with prospective economic advantage, arguing that CHS engaged in a series of intentional acts, both before and after the Spin-Off, that made it impossible for Quorum to capitalize on business opportunities.[73]

After two weeks of evidentiary hearings and post-hearing briefing, on January 3, 2019, the arbitrators issued an award denying Quorum's claims regarding the TSAs and for tortious interference.[74]

The CHS Defendants argue that many of the alleged facts and circumstances underlying the Plaintiffs' claims for unjust enrichment and illegal dividend in this adversary proceeding are identical to facts alleged in Quorum's Arbitration claims and could have been raised in the arbitration. Therefore, the CHS Defendants argue that Quorum already litigated - - and lost - - the same issues and, therefore, claim and issue preclusion bar the Plaintiffs' state law claims.

---

[72] Revenue Cycle Service Center and CHSPSC, LLC.

[73] *See* CHS Defendants' Decl. in support of the Motion to Dismiss (Adv. Docket No. 45), Ex. 10, ¶ 32.

[74] *Id.*, Ex. 9.

The Plaintiffs argue that claim and issue preclusion do not apply here because there is no privity between Quorum and the Plaintiffs. The Plaintiffs also contend that the Arbitration claims are not identical to the claims in this adversary proceeding.

Claim preclusion (or res judicata) bars re-litigation of a claim if "there has been (1) a final judgment on the merits in a prior suit involving (2) the same claim and (3) the same parties or their privies."[75] Claim preclusion "gives dispositive effect to a prior judgment if a particular issue, although not litigated, *could* have been raised in the earlier proceeding."[76]

Issue preclusion (also referred to as collateral estoppel) bars parties from re-litigating matters that they had a full and fair opportunity to litigate.[77] The Third Circuit analyzes four requirements for applying issue preclusion: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action."[78] The Third Circuit also considers whether the party being precluded had a full and fair opportunity to litigate the issue in question in the prior action.[79]

For either claim or issue preclusion to apply here, there must be privity between pre-bankruptcy Quorum and the Plaintiffs. "In its broadest sense, privity is

---

[75] *In re Montgomery Ward, LLC*, 634 F.3d 732, (3d Cir. 2011) (quoting *E.E.O.C. v. U.S. Steel Corp.*, 921 F.2d 489, 493 (3d Cir. 1990)).

[76] *CoreStates Bank, N.A. v. Huls America, Inc.*, 176 F.3d 187, 194 (3d Cir. 1999).

[77] *Sprint Commc'n Co. L.P. v. Charter Commc'n, Inc.*, 2021 WL 982726, *2 (D. Del. Mar. 16, 2021)(citing *Montana v. United States*, 440 U.S. 147, 153 (1979)).

[78] *Id.* (quoting *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006)).

[79] *Id.*

defined as mutual or successive relationships to the same right of property, or such

an identification of interest of one person with another as to represent the same

legal right."[80]  The Third Circuit, following the Supreme Court, recognizes six

categories when nonparty preclusion may be appropriate:

(1)  the nonparty agrees to be bound by the determination of issues in an action between others;

(2)  a substantive legal relationship – i.e., traditional privity – exists that binds the nonparty;

(3)  the nonparty was adequately represented by someone with the same interests who was a party;

(4)  the nonparty assumes control over the litigation in which the judgment is rendered;

(5)  the nonparty attempts to bring suit as the designated representative of someone who was a party in the prior litigation; and

(6)  the nonparty falls under a special statutory scheme that expressly forecloses successive litigation by nonlitigants.[81]

Here, neither the Litigation Trustee nor the Senior Noteholders agreed to be

bound by, or in any way had control over, the pre-bankruptcy arbitration.   The

question focuses on whether the relationship between the parties would give rise to

privity under elements (2), (3), (5) or (6) above.

Claim preclusion may apply to a successor-in-interest, despite the general

rule against nonparty preclusion.[82]  However, the Third Circuit has recognized that

a trustee in bankruptcy is not simply the successor-in-interest to the debtor because

---

[80] *Trustees of General Assembly of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*, 527 F.Supp.3d 722, 762 (E.D. Pa. 2021) (quoting *Greenway Ctr. Inc. v. Essex Ins. Co.*, 475 F.3d 139, 149 (3d Cir. 2007)).

[81] *Patterson*, 527 F.Supp.3d at 762-63 (quoting *Taylor v. Sturgell*, 553 U.S. 880, 893-94, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008)).

[82] *Montgomery Ward*, 634 F.3d at 737 (citing *Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008)).

the trustee also represents the general creditors' interests.[83] Thus "the legal relationship between the trustee and the pre-bankruptcy debtor is incomplete, particularly when the interests of the creditors diverge from those of the debtor."[84] Here, there is no indication that interests of pre-bankruptcy Quorum and the Plaintiffs are so close that the Court can determine privity on a motion to dismiss.[85] The Court will deny the CHS Defendants' motion to dismiss state law claims based on the pre-bankruptcy arbitration proceeding.

B.   Should the illegal dividend claim be dismissed under state law?

The CHS Defendants also argue that the illegal dividend claim must be dismissed because the transfer that the Plaintiffs labeled the "Spin-Off Dividend" was not a dividend at all but, instead, was "one side of a bilateral exchange" between CHS and Quorum.  Without an allegation of a formal declaration of a dividend by Quorum's board of directors, the CHS Defendants assert that there is no basis under Delaware law for an illegal dividend claim.

The Plaintiffs respond that the Complaint contains numerous allegations that the SDA's language does not accurately represent the true nature of the Spin-Off Dividend and that the Complaint alleges that CHS and Quorum's internal documents refer to the transfer as a "dividend" or "distribution."  The Plaintiffs rely on the case *MC Asset Recovery* in which the plaintiff argued that transfers were, in

---

[83] *Montgomery Ward*, 634 F.3d at 738.  *See also Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.)*, 2019 WL 647027, *5 (Bankr. D. Del. Feb. 15, 2019) ("[T]he Trust can not be considered 'close enough' to the prepetition entity, Maxus, that it can be precluded based on claims that Maxus did not assert in the [earlier litigation]").

[84] *Id.*

[85] Moreover, at this stage of the proceedings, there is insufficient basis for determining whether the causes of action could be considered identical for the Arbitration Award to have a preclusive effect.

substance, dividends because there was no real consideration to support the transfers.[86] The *MC Asset Recovery* court denied the defendant's request for summary judgment due to factual disputes and noted "[i]n determining whether a particular transaction constitutes a 'dividend' to shareholders, Delaware courts have placed an emphasis on substance over form, and focused on the 'economic reality of the transaction.'"[87]

Similarly, the Complaint here alleges a plausible claim for illegal dividend and disputes over factual issues will not be resolved on a motion to dismiss. The Motion to Dismiss the illegal dividend claims will be denied.

C.   Is the unjust enrichment claim time-barred?

The CHS Defendants argue that the unjust enrichment claim is time-barred and must be dismissed because the transfer occurred on April 29, 2016 - - nearly four years before the petition date - - and the Defendants assert that the transfer is beyond Delaware's three-year statute of limitations.[88]

The Plaintiffs contend that the Complaint alleges that CHS participated in a fraud against Quorum's creditors and took steps to conceal the fraudulent nature of the projections and Quorum's financial condition. For this reason, the Plaintiffs assert that the statute of limitations was tolled because the fraudulent activity prevented the injury from being discovered.

---

[86] *MC Asset Recovery, LLC v. Southern Co.*, 2009 WL 10666059, *12 (N.D. Ga. Feb. 5, 2009) (applying Delaware law).

[87] *Id.* at 13 (citing *Off'l Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 969-70 (D. Del. 1994) (*abrogated, in part, on other grounds, as recognized in Quadrant Structured Products Co., Ltd. v. Vertin*, 115 A.3d 535, 545-47 (Del. Ch. 2015)).

[88] *Vichi v. Koninklijke Philips Electronics N.V.*, 2009 WL 4345724, 15 (Del. Ch. Dec. 1, 2009) (citing 10 Del. C. § 8106(a)).

"[A] statute of limitations may be tolled where a defendant fraudulently has concealed from a plaintiff facts necessary to put him on notice of a breach."[89] "Frequently, determining whether the statute of limitations has been tolled pursuant to the 'discovery rule' or due to fraudulent concealment requires a factual inquiry not amenable to resolution on a motion to dismiss."[90]  The Court agrees that at this stage of the proceedings, the Court cannot determine whether the statute of limitations has been tolled and the Motion to Dismiss the unjust enrichment claim on this basis will be denied.

3.    **Individual Noteholders' Breach of Contract Claim**

The Complaint asserts a breach of contract claim on behalf of the Individual Senior Noteholders against the CHS Defendants for unpaid amounts due on the Senior Notes.  The Complaint alleges that, at the time the Senior Note Debt was incurred, Quorum and CHS operated as a single economic unit.  The CHS Defendants argue that the breach of contract claim must be dismissed because the Complaint fails to allege facts to support an alter ego theory for liability.

"It is a general principle of contract law that only a party to a contract may be sued for breach of that contract."[91]  To state a cognizable claim to pierce the corporate veil, a plaintiff must allege facts demonstrating the parent corporation's

---

[89] *Vichi v. Koninklijke Philips Electronics N.V.*, 85 A.3d 725, 789 (Del. Ch. 2014).
[90] *TL of Florida, Inc. v. Terex Corp.*, 54 F.Supp.3d 320, 329 (D. Del. 2014).
[91] *Wallace ex rel. Cencom Cable Income Partners II, Inc. L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999).

complete domination and control of the subsidiary "to the point that [the subsidiary] no longer has legal or independent significance of [its] own."[92]

"Piercing the corporate veil under the alter ego theory 'requires that the corporate structure cause fraud or similar injustice."[93]  In other words, the plaintiff must allege that the corporation is a sham and exists for no other purpose than as a vehicle for fraud.[94]

The CHS Defendants argue that the Plaintiffs' alter ego theory is implausible because after the Spin-Off (and at the time of the default), Quorum was a publicly traded company that had operated independently for years.  The Defendants claim that Quorum autonomously managed the hospitals in its portfolio, renegotiated its debt instruments, divested assets, and eventually filed bankruptcy without the involvement of its former parent.  The CHS Defendants argue these actions do not support a "sham entity" theory.

In response, the Plaintiffs argue that the legally relevant time for the alter ego allegations is the time the Spin-Off Debt was incurred.  The Plaintiffs contend that the Complaint contains numerous allegations supporting the alter ego claim, including (i) that Quorum was insolvent and inadequately capitalized from inception, (ii) that Quorum's only functioning officers prior to the Spin-Off were CHS employees who would either resign from Quorum or retire shortly before or immediately after the Spin-Off; (iii) that CHS inflated projections and falsified financials to dupe lenders into lending funds to Quorum; (iv) that the amount of the

---

[92] *Id.* at 1183-84.
[93] *Id.* at 1184.
[94] *Id.*

debt raised by Quorum was not based on Quorum's needs, but was designed to offload CHS's debt problem onto Quorum without regard for Quorum's financial well-being.

"The alter ego doctrine is used to pierce the corporate veil when a corporation has created 'a sham entity designed to defraud investors and creditor.'"[95]  The Court is satisfied that the Complaint contains sufficient factual allegations to support the alter ego theory.   The Motion to Dismiss Count Twelve is denied.

## CONCLUSION

For the reasons stated herein, the Court concludes that the CHS Defendants' Motion to Dismiss will granted, in part, and denied, in part, as follows:

(i)      The Motion to Dismiss will be GRANTED as to Counts I and II (Avoidance and Recovery of the Spin-Off Dividend as a Constructive and Intentional Fraudulent Transfer under 11 U.S.C. §§544 and 550 and Applicable State Law); and

(ii)      The Motion to Dismiss will be DENIED as to Count XII (Breach of Contract for Unpaid Amounts Due on the Senior Notes), Count XIII (Illegal Dividend Under Delaware Law), Count XIV (Aiding and Abetting Illegal Dividend), and Count XV (Unjust Enrichment).

An appropriate Order follows.

FOR THE COURT:

Dated:  March 16, 2023          BRENDAN LINEHAN SHANNON
                                United States Bankruptcy Judge

---

[95] *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 577 (Del. 2019).